IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| C.R. BARD, INC., a New Jersey corporation, BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, and BARD ACCESS SYSTEMS, INC., a Utah corporation,<br><br>Plaintiffs,<br><br>v.<br><br>MEDICAL COMPONENTS, INC., a Pennsylvania corporation.<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION TO BIFURCATE<br><br><br>Case No. 2:17-CV-754 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiff/Counterclaim Defendant's Motion to Dismiss Defendant/Counterclaim Plaintiff's Second, Fifth, and Sixth counterclaims, and to strike its Fifth and Seventh Affirmative Defenses.

I. BACKGROUND

Plaintiffs C.R. Bard, Inc., Bard Peripheral Vascular, Inc., and Bard Access Systems, Inc. (collectively, "Bard" or "Counterclaim Defendant") and Defendant Medical Components, Inc. ("MedComp" or "Counterclaim Plaintiff") are both producers of access ports. An access port is a medical device that can be implanted into a patient to provide a convenient means of blood sampling or infusing fluids into the blood stream without requiring further surgical procedures.[1] Bard alleges infringement on several of its access-port related patents, including the '639, '723, '663, '052, and '186 patents. The '639 patent relates to using power injection to push fluid into an access port. The other patents relate to identifying an already implanted access port. The '639

---

[1] Docket No. 21, at 5.

patent was issued in 2011. The '723, '663, '052 patents were issued in 2013. The '186 patent was issued in 2017.[2]

On July 19, 2018, Defendant MedComp filed its Third Amended Answer and Counterclaims ("TAAC"). Relevant to the Motion before the Court, MedComp alleges that: 1) the patents in-suit are not enforceable due to inequitable conduct before the United States Patent and Trademark Office ("PTO"); 2) Bard attempted to monopolize the power port market, and succeeded in monopolizing the market; and 3) MedComp is not liable because of several affirmative defenses, including laches, estoppel, unclean hands, fraudulent conduct, acquiescence and/or waiver, and inequitable conduct.

Bard seeks dismissal of MedComp's counterclaims under Rule 12(b)(6). Bard also asks the Court to strike MedComp's affirmative defenses under Rule 12(f), or, in the alternative, to dismiss these claims as inadequately pleaded under Rule 12(b)(6).[3]

In addition to the Motion to Dismiss, Bard also filed a Motion to Bifurcate.[4] Bard asks the Court to bifurcate and stay MedComp's antitrust claims, pending resolution of its inequitable conduct claims.[5] The Court will grant the Motion to Dismiss and deny as moot the Motion to Bifurcate.

II. SECOND COUNTERCLAIM (inequitable conduct)

In *Therasense, Inc. v. Becton*, the Federal Circuit addressed how "the inequitable conduct doctrine has plagued not only the courts but also the entire patent system."[6] The Court noted that alleging inequitable conduct has become "a common litigation tactic," asserted in "almost every

---

[2] *Id*. at 5–6.
[3] Docket No. 174, at 1, 23, 25.
[4] Docket No. 176.
[5] *Id*.
[6] 649 F.3d 1276, 1289 (Fed. Cir. 2011).

major patent case" on even the "slenderest grounds."[7] The Federal Circuit also recognized many costs of this "absolute plague,"[8] including "increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased PTO backlog, and impaired patent quality."[9] To remedy this problem, the Court "tighten[ed] the standards for finding both intent and materiality."[10]

The resulting standard for establishing a claim of inequitable conduct is rigorous. The party bringing the claim must prove that the applicant "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]."[11] Both intent and materiality must be proven by clear and convincing evidence.[12] A showing of specific intent is required; merely proving gross negligence or meeting a "should have known" standard is inadequate.[13] "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence."[14] However, to meet the clear and convincing evidence standard, specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence."[15]

The standards for adequately pleading inequitable conduct are accordingly exacting. Mere notice pleading is not sufficient. Rather, the accused infringer must meet the strict pleading standards of fraud contained in Federal Rule of Civil Procedure 9(b), including: "identification of the specific who, what, when, where, and how of the material misrepresentation or omission

---

[7] *Id*. (internal quotations and citations omitted).
[8] *Id*.
[9] *Id*. at 1290.
[10] *Id*.
[11] *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).
[12] *Therasense*, 649 F.3d at 1290.
[13] *Id*.
[14] *Id.*
[15] *Id.* (quotation marks omitted).

3

committed before the PTO."[16] "[K]nowledge and intent may be averred generally," but the pleadings must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."[17]

### a. Failure to disclose prior art

Counterclaim Plaintiff Medcomp alleges that Bard committed inequitable conduct by failing to disclose three prior art publications, including the "Herts," "Carlson," and "Gebauer" references.[18] Medcomp also alleges that Bard failed to disclose relevant information known to Bard about existing access ports, including that commercially available ports were already being used for power injection and were already identifiable based on radiographic features.[19]

As stated above, the successful pleading must identify "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."[20] To plead "who," a pleading must "name the specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it."[21] It is not enough to simply refer to "Bard" or Bard's "agents and/or attorneys."[22]

#### i. Herts Reference

With regard to the Herts Reference, to fulfill the "who" requirement, the TAAC alleges that "Bard possessed multiple copies of the Herts Reference," specifically that "Kelly Powers and

---

[16] *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).
[17] *Id.*
[18] Docket No. 168 at 91–95.
[19] *Id.* at 95–105.
[20] *Exergen*, 575 F.3d at 1327.
[21] *Id.* at 1329.
[22] *See id.*

4

Erik Ence were aware of and has [sic] possession" of the article.[23] The TAAC also asserts that a number of other Bard employees either read or knew of the Herts Reference, including Kevin Sheetz, David Cise, James Davis, Matt Draper, Jay Gerondale, John Evans, Dwight Hibdon, Susan Scott, Kelly Christian, Annemarie Boswell, John Zawacki, Alex Lockovith, Peggy Keiffer, and Kimberly Geisler.[24]

In support of the assertion that these individuals were aware of the Herts Reference and its materiality, the TAAC offers several facts, including that: 1) the Herts Reference was published in a journal that is widely-circulated within the specialty field; 2) Bard provided the Herts Reference in a 2011 FDA submission; 3) Bard cited the Hertz Reference in related patent applications subsequent to the patents in-suit; and 4) an internal 2009 Bard document included a reference to Herts.[25]

At most, these facts would tend to show that Bard was negligent in not disclosing the Herts Reference. MedComp's allegations may lend support to the argument that Bard should have known of the reference and its materiality—given that it was widely available and even cited by Bard in other documents. However, such "should have known" allegations were expressly disclaimed by the Federal Circuit Court in *Therasense,* as insufficient to show specific intent to deceive the PTO.[26] Similarly, the Federal Circuit held in *Exergen,* that "[t]he mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during

---

[23] Docket No. 168, at 92.
[24] *Id.* at 93.
[25] *Id.*
[26] *Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."[27]

Without further factual support, these allegations are insufficient to allow the Court to reasonably infer that any specific individual knew of the Herts Reference, knew it was material, and made a deliberate decision to withhold it from the PTO.

    ii. <u>Carlson Reference</u>

With regard to the Carlson Reference, to meet the "who" requirement, the TAAC alleges that a number of Bard employees were "familiar" with the Carlson Reference.[28] According to the TAAC, these individuals were aware of this Reference and its materiality for several reasons, including that: 1) the Carlson Reference was published in a journal that is widely-circulated within the specialty;[29] 2) it was cited in a Bard FDA submission (which John Evans and Kelly Powers collaborated on);[30] and 3) it was cited during prosecution of the '723 and '052 patents, as well as several related out-of-suit patents, but was not cited during prosecution of the '639.[31]

As discussed above, establishing inequitable conduct requires the identification of a "specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it."[32] Under the standard established in *Exergen*, a successful pleading may be averred generally, but requires "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."[33] Allegations that Bard personnel "should have known" of the Reference and its

---

[27] *Exergen*, 575 F.3d at 1331.
[28] Docket No. 168, at 93–94.
[29] *Id.* at 93.
[30] *Id.*
[31] *Id.*
[32] *Exergen*, 575 F.3d at 1329.
[33] *Id.* at 1327.

materiality—such as alleging that it was published in a widely circulated journal—are inadequate. Also inadequate are mere allegations that "an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application."[34]

### iii. Gebauer Reference

With regard to the Gebauer Reference, to fulfill the "who" requirement, the TAAC alleges that Kelly Powers and "Members of Bard's Port Team," "possessed a copy" of the Gebauer Reference.[35] The TAAC also asserts that, "evidencing specific intent," although the Gebauer Reference was not cited during prosecution of the '639 patent, it was cited in the subsequent prosecutions of the '723, '052 patents—and the out-of-suit '460 patent.[36]

These facts are inadequate to allow the court to infer that any specific individual "knew of the reference, knew it was material, and made a deliberate decision to withhold it."[37] The fact that the Gebauer Reference was contained in the custodial files of Kelly Powers does not show his knowledge of materiality or evidence his deceptive intent. Likewise, as stated above, "[t]he mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."[38]

### iv. Knowledge of Prior Ports

The TAAC also accuses Bard of inequitable conduct stemming from its knowledge that existing ports were already being used for power injection (relevant to the '639 patent) and

---

[34] *Id.* at 1331.
[35] Docket No. 168 at 95.
[36] *Id*. at 95.
[37] *Therasense*, 649 F.3d at 1290.
[38] *Exergen*, 575 F.3d at 1331.

7

identified using x-ray technology (relevant to the '723, '663, '052, '186, and '160 patents). These prior art ports include Bard's own existing ports as well as ports of other competitors.

To demonstrate Bard's knowledge of existing ports, MedComp points to a number of Bard's internal documents, as well as a handful of documents from other lawsuits and a previous submission to the PTO. MedComp appears to assert that these documents should have been disclosed as prior art,[39] or, alternatively, that the documents evidence Bard's intent in withholding the prior art discussed above, including the Herts, Carlson, and Gebauer references.[40]

"[P]rior art references, by definition, must be publicly available."[41] Therefore, Bard was not under any duty to disclose its internal documents. Moreover, MedComp has not pled sufficient facts to meet the "who" requirement by identifying a "specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it."[42]

However, "[n]on-public documents, such as notes or internal communications with patent prosecution counsel, may also shed light on the reasoning behind a decision to withhold a reference."[43] In support of its assertion that these documents evidence Bard's intent to withhold the Herts, Carlson and Gebauer references, MedComp cites *In re '639 Patent Litigation*. In that case, the court noted the "striking disparity" between what a company's "employees and agents were saying to each other and what they were saying to the PTO."[44] For example, the court identified a two-year delay between the time that a specific company agent internally

---

[39] Docket No. 168, at 95–102.
[40] Docket No. 189, at 8–9.
[41] *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 319 (D. Del. 2013).
[42] *Exergen*, 575 F.3d at 1329.
[43] *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 323 (D. Del. 2013)
[44] *In re '639 Patent Litig.*, 154 F. Supp. 2d 157, 194 (D. Mass. 2001), *aff'd sub nom. SmithKline Beecham Corp. v. Copley Pharm., Inc.*, 45 F. App'x 915 (Fed. Cir. 2002).

acknowledged that a particular prior art article was material and the time that article was disclosed to the PTO.[45]

Unlike in *In re '639 Patent Litigation*, MedComp does not allege any direct connection between the identified Bard documents and the withheld prior art. MedComp alleges that there is substantive overlap, but does not identify anything that discusses any of the three prior art articles, identifies it as material, and evidences the intent of a specific individual to withhold the article.

Bard also argues that some of the documents cited by MedComp are not relevant because they are dated well past the relevant time period. MedComp does not respond to this argument.

In summary, Bard's internal documents cannot be considered prior art. Neither can documents that did not exist during the relevant time period. In addition to not being prior art, the documents MedComp cites also do not serve as compelling evidence of Bard's specific intent to withhold the Herts, Carlson and Gebauer References. Therefore, MedComp's claim of inequitable conduct based on knowledge of prior art ports is not well pleaded.

  b. *Inventorship*

MedComp first asserts that all the patents in-suit, including the '639, '723, '663, '052, and '186 patents, are unenforceable because they do not list the correct inventors. However, MedComp's allegations are based on actions Bard allegedly took during the prosecution of several out-of-suit patents, the '302 and '460 patents, and the '518 provisional patent.[46] This is problematic because, as explained below, MedComp is essentially asking the Court to find that these out-of-suit patents are invalid, and, based on that finding, declare the in-suit patents invalid.

---

[45] *'639 Patent*, 154 F. Supp. 2d at 192.
[46] The patents in-suit claim priority to these patents. The '663, '052, '723, and '186 patents claim priority to the '518 provisional patent application. The out-of-suit '302 patent does as well. The '639 patent claims priority to the '460 patent. Docket No. 168, at 132, 143.

"A patent is invalid if more or fewer than the true inventors are named."[47] To be properly named an "inventor," a person must have "contribut[ed] in some significant manner to the conception of the invention."[48] Federal law allows for correction of patent inventors.[49] However, changing patent inventors with deceptive intent may cause a patent to be invalidated.[50]

MedComp claims that with deceptive intent and "for litigation purposes," Bard engaged in a program to remove the proper inventors from the patents in-suit, as well as the '302 and '460 patents, and the '518 provisional patent.[51] MedComp claims that because inventors have a duty to disclose information to the PTO, Bard endeavored to change the listed inventors in order "to reduce Bard's exposure that its inventors on the Bard patents violated their duty of candor and good faith."[52] MedComp alleges that Bard "attempted to try and hide the fact that its Port Team personnel were well aware that the features of the claims of these patents were in the prior art and were utilized in medical procedures that occurred prior to 2005 in the U.S."[53]

Regarding the patents in suit, MedComp alleges that because the in-suit '052, '723, '663, and '184 patents (which relate to port identification) claim priority to the '302 patent, they should also be invalidated.[54] Likewise, MedComp alleges that because the in-suit '639 patent (which relates to power injection) claims priority to the '460 patent, it should also be invalidated.[55]

---

[47] *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).
[48] *Id.* (quotation marks omitted).
[49] 35 U.S.C § 256(a) ("Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.").
[50] *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1571 (Fed. Cir. 1989).
[51] Docket No. 168, at 141.
[52] *Id.*
[53] *Id.* at 141.
[54] *Id.* at 131–143.
[55] *Id.* at 143.

Although MedComp also asserts that the in-suit patents name incorrect inventors, it does not offer sufficient facts to support that allegation beyond its discussion of why the inventors for the out-of-suit patents are incorrect.[56]

It is a well-established that under the doctrine of infectious unenforceability, inequitable conduct committed during the prosecution of one patent can, in certain circumstances, taint another patent.[57] However, it is not well established that this doctrine enables a court to hold out-of-suit patents unenforceable. The district court in *Hoffman-La Roche, Inc. v. Promega Corp*, considered this issue, reasoning that although a party urged the court to hold multiple patents unenforceable that were not at issue in the litigation, the party provided no legal support for such an expansive exercise of the court's equitable powers.[58] The court concluded that "the court's equitable powers do not extend to patents that are not at issue in this litigation."[59] Similarly, in *Global Tech Led, LLC v. Hilumz International Corp.*, the district court reasoned that:

> In essence, Defendants seek to obtain an unofficial declaration of unenforceability as to a patent not otherwise before the Court, and then use that declaration as the predicate for having the in-suit '424 Patent Defendants are accused of infringing declared legally unenforceable. The Court's research has revealed no case in which an in-suit patent was declared unenforceable based on inequitable conduct relating to the procurement of a different patent that is out-of-suit.[60]

MedComp does not address this issue directly. Rather, it argues broadly that "[i]nequitable conduct during the prosecution of parent patent can undermine the enforceability of a descendant patent";[61] however, MedComp does not offer any examples of a district court taking the type of

---

[56] *Id*. at 131–144.

[57] *Nilssen v. Osram Sylvania, Inc.,* 504 F.3d 1223, 1230 (Fed. Cir. 2007).

[58] *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1016 (N.D. Cal. 2004).

[59] *Id*.

[60] No. 2:15-CV-553-FTM-29CM, 2017 WL 588669, at *11 (M.D. Fla. Feb. 14, 2017).

[61] Docket No. 189, at 14.

action contemplated here. The Court's independent research also has not identified any instances of a court finding in-suit patents unenforceable based on the court's finding that out-of-suit patents are invalid.[62] The Court will decline to exercise its equitable powers over out-of-suit patents.

### III. FIFTH and SIXTH COUNTERCLAIMS (attempted monopolization and monopolization)

MedComp asserts antitrust counterclaims based on Bard's alleged misconduct in procuring the '639 patent. So-called "Walker Process" claims allow a party to bring an antitrust action for a fraudulently obtained and enforced patent.

> In order to prevail on a *Walker Process* claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim.[63]

The required showing of "knowing and willful fraud on the patent office" for a Walker Process claim is essentially the same as for proving inequitable conduct independently.[64] As discussed above, MedComp's allegations of inequitable conduct are not sufficiently pled. Therefore, its Walker Process claims must fail.

---

[62] One narrow but notable exception to this is the Federal Circuit's holding in *Nilssen v. Osram Sylvania, Inc,* 504 F.3d 1223, 1229–1230 (Fed. Cir. 2007). In that case, the court did exercise its power over out-of-suit patents where the patents had been withdrawn from the case on the eve of trial. Independent research has not identified any extension of this doctrine to include patents that were never in-suit.

[63] *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).

[64] *Id.* at 1307 ("After *Therasense*, the showing required for proving inequitable conduct and the showing required for proving the fraud component of Walker Process liability may be nearly identical.").

IV. **FIFTH AFFIRMATIVE DEFENSE** (laches, estoppel, unclean hands, fraudulent conduct, and acquiescence and/or waiver)

   *a. Laches*

"Laches is a doctrine that bars a plaintiff's claim when there has been unreasonable, prejudicial delay in commencing suit."[65] "To prevail on a defense of laches, a defendant must establish that (1) the plaintiff's delay in filing a suit was 'unreasonable and inexcusable,' and (2) the defendant suffered 'material prejudice attributable to the delay.'"[66]

Counterclaim Defendant MedComp does not plead any facts to show delay on the part of Bard in filing suit. Nor does MedComp allege any facts to show "material prejudice attributable to the delay." Therefore, this allegation is not adequately pled.

   *b. Estoppel*

To prove estoppel, a party must plead three elements. First, "that the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that he does not intend to enforce the patent against the alleged infringer."[67] Second, "that the alleged infringer relies on the patentee's conduct."[68] Third, "that due to the reliance, the alleged infringer will be materially prejudiced if the patentee is permitted to proceed with its infringement suit."[69]

Counterclaim Defendant MedComp does not plead any facts to establish any of these elements. Therefore, this allegation is not adequately pled.

---

[65] *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 967 (2017) (Breyer, J., dissenting) (citing 1 D. Dobbs, Law of Remedies § 2.3(5), p. 89 (2d ed. 1993)).
[66] *Pei-Herng Hor v. Ching-Wu Chu*, 699 F.3d 1331, 1334 (Fed. Cir. 2012) (internal citation omitted).
[67] *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995).
[68] *Id.*
[69] *Id.*

### c. Unclean hands and fraudulent conduct

Courts of equity "apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."[70]

> [W]henever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.[71]

Unclean hands is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion."[72] In applying the doctrine of unclean hands, courts are not primarily concerned with the interests of the parties, but with protecting the integrity of the court itself from improper action.[73] None of the alleged actions in this case rise to the level of such an "unconscionable act," and the Court will decline to exercise its discretionary power to refuse Bard access to the Court based on unclean hands.

### d. Acquiescence and/or waiver

In its pleading regarding "acquiescence," MedComp again asks the Court to evaluate Bard's actions in prosecuting out-of-suit patents. MedComp asserts that during prosecution of the '660 patent, which occurred after the '639 patent was issued, the PTO rejected a claim related to port pressure. Bard allegedly failed to disclose to the PTO that a related claim had been approved

---

[70] *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).
[71] *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1379 (Fed. Cir. 2001) (quoting *Keystone*, 290 U.S. at 245–46).
[72] *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) (quoting *Keystone Driller,* 290 U.S. at 245).
[73] *See, e.g.*, *Priestley v. Astrue*, 651 F.3d 410, 430–31 (4th Cir. 2011); *Hall v. Wright*, 240 F.2d 787, 795 (9th Cir. 1957); *Frank Adam Elec. Co. v. Westinghouse Elec. & Mfg. Co.*, 146 F.2d 165, 167–68 (8th Cir. 1945).

as part of the '639 patent. MedComp claims that acquiescence in the later '660 patent should be retroactively applied to the '639 patent.[74] MedComp also asserts that because Bard claims were rejected in a foreign patent application and Bard acquiesced, the subject matter of the '639 claims should be held invalid.[75]

In addition to the allegations regarding out-of-suit patents, MedComp also asserts that because several claims of the '186 patent were rejected and Bard acquiesced, "the Bard Attorneys acknowledged that the subject matter of these claims are not allowable and are invalid subject matter."[76]

MedComp offers no legal support for any of these assertions; however, construing the pleading liberally, the Court has attempted through independent research to identify relevant case law.

The Federal Circuit has defined a doctrine of acquiescence that deals with the resulting scope of a patent after a claim is rejected. Specifically, the doctrine concerns the patent holders rights in defending the validity of patents in future litigation.

> [I]n ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee narrows his or her claims by amendment, or lets stand an examiner's restrictive interpretation of a claim. But these principles do not suggest that a patentee may advance during litigation only those arguments in support of patentability that were made before the Patent Office, nor that the negation of an argument advanced during prosecution necessarily negates patentability as well.[77]

---

[74] Docket No. 168, at 130-131.
[75] *Id.* at 73.
[76] *Id.* at 128.
[77] *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) (internal citations omitted).

15

This doctrine clearly does not deal with the limitations imposed on other patent applications when an applicant acquiesces to a claim rejection. Because this affirmative defense is not well pled, it will be dismissed.

## V. SEVENTH AFFIRMATIVE DEFENSE (inequitable conduct)

In its Seventh Affirmative Defense, MedComp asserts inequitable conduct. This claim is duplicative of the inequitable conduct claims addressed above and will also be dismissed.

## VI. CONCLUSION

It is therefore

ORDERED that Counterclaim Defendants' Motion to Dismiss (Docket No. 174) is GRANTED. It is further

ORDERED that Counterclaim Defendants' Motion to Bifurcate (Docket No. 176) is DENIED as moot.

DATED this 18th day of April 2019.

BY THE COURT:

Ted Stewart
United States District Judge